Arturo Gomez RIVERA, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–07–588 CR.

Court of Appeals of Texas.

Submitted on Aug. 14, 2008.

Decided Oct. 15, 2008.

Karen Zellars, Houston, for appellant.

William Lee Hon, Dist. Atty., Joseph E. Martin, III, First Asst. Dist. Atty., Livingston, for state.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

A jury convicted appellant Arturo Gomez Rivera of two counts of aggravated sexual assault of a child, and the trial court sentenced Rivera to twenty years of confinement for count one and fifteen years of confinement for count two, with the terms to run consecutively. Rivera filed this appeal, in which he raises two issues concerning the admission of evidence about his previous sexual misconduct involving a minor. *See* TEX.R. EVID. 403, 404(b). Because we find that the trial court did not abuse its discretion by determining that the challenged evidence was admissible to rebut defensive theories raised during opening statement, and that the evidence's probative value outweighed the danger of unfair prejudice, we affirm.

### BACKGROUND

#### Opening Statements

In his opening statement, defense counsel suggested to the jury several bases for challenging the credibility of the victim ("Doe"), as well as an allegation of lack of opportunity for Rivera to have committed the offenses. Defense counsel emphasized that Doe's parents never noticed any physical or emotional problems with Doe during the period of time in which the assaults allegedly occurred, and that Doe never seemed reluctant to have contact with Rivera. Rivera's counsel also mentioned that the sexual assault nurse examiner who examined Doe found no physical evidence of

sexual assault. In addition, defense counsel pointed out that many of the assaults allegedly occurred in the small mobile home Rivera shared with three other individuals, and that none of those individuals saw or heard Rivera do anything inappropriate with Doe. Moreover, defense counsel stated that Doe told two people that Rivera did not sexually assault him. Furthermore, defense counsel argued as follows:

> Ladies and gentlemen, there will also be testimony regarding a motive. [M.G.], that's [Doe]'s mother, brought a baby illegally into the United States from Mexico. The baby was not hers. Nevertheless, she secured a birth certificate for the baby showing that the baby was hers and that the baby had been born in the United States. [M.G.] knew that [Rivera] knew and that [Rivera] disapproved.

Lastly, defense counsel told the jury that Rivera would testify that he never assaulted Doe or acted inappropriately toward him, and that "the incidents described by [J.G.] never took place."

## Trial Testimony

The victim's older brother, J.G., who was the State's second witness, testified that he was ten years old when he met Rivera at church, and Rivera, who was a close friend of J.G.'s family, began offering him Bible lessons at Rivera's home. J.G. explained that Rivera lived in a trailer, which he shared with three other individuals. According to J.G., while he was at Rivera's home, Rivera showed him adult magazines, and J.G. testified that Rivera "would tell me that I had good legs and had a sexy butt and he would caress me on my ear and everything, kiss me and stuff like that." J.G. also testified that Rivera rubbed his leg with his hand, which made him feel uncomfortable, but he did not tell his parents because Rivera threatened him.[1]

According to J.G., Rivera showed him adult videos depicting "men having sex and men and women having sex." In addition, J.G. testified that when he traveled in Rivera's car to church activities, Rivera caressed his leg and kissed his ear. Rivera asked J.G. if he had a girlfriend, and at the end of the conversation, Rivera told J.G. that he liked men. When J.G. was twelve years old, he spent the night at Rivera's house while his parents were out of town, and while he was sleeping, Rivera

1. Prior to trial, Rivera's counsel filed a motion to suppress evidence of extraneous offenses, and the court denied the motion. In addition, when the State offered the testimony of J.G. regarding Rivera's actions, defense counsel objected, obtained a running objection to all such testimony, and obtained a limiting instruction. The limiting instruction read as follows:

> Evidence has been introduced that the Defendant committed offenses, wrongs or acts, other than that for which he is on trial, with respect to [J.G.]. You are instructed that you can not consider such evidence for any purpose unless you first find from the evidence presented beyond a reasonable doubt that the Defendant did commit those other offenses, wrongs or acts, if any, with respect to [J.G.]. There-

fore, if the State has not proven the Defendant's guilt of those other offenses, wrongs or acts, if any, beyond a reasonable doubt, or if you have a reasonable doubt of the Defendant's guilt of those other offenses, wrongs or acts, if any, you shall not consider such evidence for any purpose.

Further, even if you find that the State has proven, beyond a reasonable doubt, the Defendant's guilt of those other offenses, wrongs or acts, if any, with respect to [J.G.], you may only consider such evidence as evidence of motive, opportunity, intent, preparation, plan, or knowledge, in relation to the offense for which Defendant is on trial, and you may not consider those other wrongs or acts, if any, for any other purpose.

touched his stomach and attempted to grab his penis. J.G. awakened and told Rivera to stop. The three other individuals who lived at Rivera's house were all at home when the incident occurred. J.G. explained that when he reached approximately seventeen years of age, Rivera stopped touching him. After J.G. moved away from home, he eventually told his parents what had happened with Rivera because he did not want the same thing to happen to his younger brother. Based upon the information J.G. related to his father, his parents spoke with the victim and filed a report.

Doe, who was fourteen years old at the time of the trial, testified that Rivera was a family friend who lived nearby and attended the same church as Doe and his family.[2] At around age ten, Doe began going to Rivera's house for Bible lessons. Doe testified that he had also been in Rivera's car, and Rivera had taken him to a mall. When Doe was at Rivera's house, Rivera sometimes showed him books and magazines that depicted "[g]irls and girls and girls and men and men and girls." When Rivera showed Doe the books and magazines, Rivera rubbed Doe's leg, kissed Doe on the lips, and asked Doe if he liked the materials. Doe testified that this behavior happened many times. In addition, Doe testified that Rivera wrote down web addresses for him so that Doe could access pornographic materials on the internet.

Doe testified that when he was ten years old, Rivera would take him to a dirt road, turn off the car and lights, and kiss him. In addition, Doe testified that Rivera showed him movies, some of which depicted sexual acts. Doe explained that he did

not tell his parents about Rivera's actions because Rivera threatened to punch him, and he was frightened of Rivera.

Doe testified that he sometimes spent the night at Rivera's house, and the first time he did so, Rivera rubbed Doe's leg and kissed his lips. Doe testified that on other occasions when he spent the night with Rivera, both at Rivera's home and at a hotel room out of town, Rivera engaged in the acts of oral and anal penetration alleged in the indictment. Doe explained that Rivera's house had only two bedrooms, and Rivera sometimes told Doe not to make any noise because the other men who lived there were sleeping. Doe testified that he never cried out, so the other people in the house never heard anything.

After Doe's brother told his parents about what Rivera had done to him, Doe's parents met with Rivera, and Doe then told his brother-in-law about what Rivera had been doing to Doe. Doe testified that he feared that other children would make fun of him if they knew about what happened, and he told some acquaintances from school that nothing had happened. Doe eventually told his parents and a representative from the Texas Department of Family and Protective Services ("DFPS") about what Rivera had done to him.

Shawna Farrar, an investigator with the DFPS, testified that she interviewed Doe after the Livingston Police Department requested that she do so. According to Farrar, Doe reported numerous acts of sexual contact with Rivera, which occurred when Doe was between eleven and thirteen years of age.

Detective Matt Parrish of the Livingston Police Department testified that during

---

**2.** Lisa Sebaugh, an educational diagnostician with Livingston Independent School District, testified that Doe has learning disorders and is enrolled in the school's special education program. Sebaugh opined that because of his learning disabilities, Doe would have difficulty testifying.

the course of investigating the case, he met with Doe's family and set up interviews with the proper agencies. After DFPS completed its interview with Doe, Detective Parrish prepared a complaint, and a warrant issued for Rivera's arrest. Patrol officers who arrived at Rivera's residence to arrest him called Detective Parrish to the scene. Upon arriving at Rivera's residence, Detective Parrish advised Rivera of his rights and obtained Rivera's permission to search the residence. Detective Parrish searched the living area, bedroom, and bathroom of Rivera's home, and he found two videotapes that depicted explicit homosexual acts between adults, a Playboy magazine, a notebook, some photographs, cream, and partially clothed dolls.

Paula Armstrong, the district manager of Movie Gallery Video Stores, testified that there are two Movie Gallery Video Stores in Livingston, and both stores rent adult videos. Armstrong explained that her company received a subpoena from the Polk County District Attorney's office regarding any accounts held by Rivera. Armstrong testified that Rivera has accounts at both of the Movie Gallery Video Stores in Livingston, and the records of Rivera's account reveal that he rented 129 adult videos from one store and 53 adult videos from the other store. Armstrong also testified that Rivera's account information indicated that he purchased an adult video at one store and nine adult videos, as well as an adult magazine, at the other location.

Jesse Alaniz testified that he has known Rivera, Doe, and J.G. for a number of years, and that he is one year younger than J.G. Alaniz testified that when he asked Doe about whether something happened between Doe and Rivera, Doe said, "No. No. Nothing happened." Alaniz also testified that he asked Doe the same ques-

tion a second time, and Doe responded in the same way. Alaniz further explained that when Rivera was arrested, Alaniz served as an interpreter.

M.G., Doe's mother, testified that Rivera taught Doe two days per week. M.G. eventually learned that Doe said that Rivera had inserted his penis into Doe's anus. M.G. explained that she never noticed anything physically or emotionally wrong with Doe. M.G. testified that she adopted a child who was born in Mexico, but the child's birth certificate indicates that M.G. gave birth to the child in Polk County. According to M.G., Rivera knew about the child's origins from the beginning. After J.G. told M.G.'s husband what had happened with Rivera, M.G. met with Doe and Rivera. According to M.G., each time she would ask Doe if Rivera had done something to him, Rivera would not let Doe speak, and Rivera encouraged Doe to say that Rivera was Doe's best friend.

Ken Victory Hayes testified that he knows Rivera, Doe, and Doe's family. Hayes hired Rivera to do maintenance work at a group of buildings Hayes owned. Doe worked with Rivera at Hayes's property approximately three times, and Hayes testified that Doe never said that Rivera had sexually assaulted him. Gordon Hayes testified that Rivera did some work around his house, and Doe sometimes helped Rivera. According to Gordon, Doe never complained about any molestation by Rivera, and he never saw Rivera act inappropriately toward Doe.

Daniel Rivera testified that he is thirteen years old, and he has known his uncle, Arturo Rivera, for seven years. Daniel testified that he also knows Doe, who he met at church. After learning that Rivera had been arrested, Daniel asked Doe at school if Rivera had done anything to him, and Doe said that Rivera had not.

Angel Aldalgo testified that he and two other individuals once lived with Rivera. According to Aldalgo, Doe visited frequently, and Doe never told him that Rivera had molested him. Aldalgo further explained that he had never seen Rivera molest Doe, and he denied seeing any pornographic magazines or videos at Rivera's residence. Aldalgo denied ever hearing Rivera discuss Doe's parents' adopted child in a negative manner.

Brenda Garrison, a sexual assault nurse examiner with Child Abuse and Forensic Services in Beaumont testified that she examined Doe and prepared a report regarding the results of the examination. Garrison testified that she found no evidence of physical trauma upon examining Doe, but she indicated "sexual assault by history" in her report. Garrison explained that she examined Doe on January 9, 2006, and since the last sexual assault of Doe occurred in late October of 2005, two and a half months earlier, she would not expect to find evidence of anal trauma or laxity.

Rivera testified that he met Doe and his family at church, and he helped Doe and his brother by teaching them to read Bible verses in Spanish. Rivera denied ever trying to grab Doe's brother's penis or touch him inappropriately. Rivera testified that Doe would come to his house to study and "hang out for an hour or two[.]" Rivera denied showing Doe pornographic videos. Rivera also denied committing the offenses alleged in the indictment. Rivera explained that he knew that Doe had an adopted brother who was born in Mexico, and Doe's mother knew that Rivera possessed that knowledge. In addition, Rivera explained that during a meeting with Doe and his parents, Doe's parents confronted Rivera about what Doe's brother J.G. had told them. Rivera also denied threatening anyone at the meeting, and he denied renting pornographic videos.

## Closing Arguments

During closing arguments, the State discussed J.G.'s testimony, but did not strongly emphasize it. Before discussing J.G.'s testimony, the State mentioned the limiting instruction and explained to the jury the permissible purposes for which J.G.'s testimony could be considered. In discussing J.G.'s testimony, the State argued as follows:

And then, what did [Rivera] do when he had access to the children? [Doe] doesn't know what-and [J.G.] don't [sic] know what things are classic as far as grooming a child. Ms. Farrar does. And that's exactly what he did. He put himself in a position of authority and influence over those children. He then began to gradually show them different things, "How do you like that?" He brought about in them an appetite for things that are unmentionable.

And then, after he had taken their defenses down, he took advantage of the children. Luckily, [J.G.] had the strength of will that [Doe], being who he is, didn't have. And [J.G.] resisted to the point that he was not subject to the abuse that [Doe] was.

On the other hand, defense counsel discussed J.G.'s testimony in great detail during his closing, arguing as follows:

I'm going to talk about [J.G.].... And during voir dire I read the instruction to you earlier.... Evidence is introduced for one purpose but not for another. And [the trial judge] gave you the written instruction regarding that, and [J.G.] is not the Mark Doe in the indictment. Mr. Rivera is not on trial for anything he did to [J.G.]....

And I want to explain to you why you should not consider the testimony of [J.G.] for any purpose. And the reason

is that the State did not prove what he said beyond a reasonable doubt.

[J.G.] testified to a number of incidents, but he could only specifically remember two incidents. Only two. And they happened when he was either 10, 11, or 12 years old. When he testified, he was 21 years old. When he first reported these, he was 19 years old. So he is trying to remember when he is 19 and when he is 21 something he thinks happened when he was 10, 11, or 12.

The incident—the more significant incident is the incident in which he alleges that Mr. Rivera tried to grab his penis.... This happened at night. It happened while [J.G.] was asleep on the floor. And if I understand correctly, [Rivera] was sleeping next to him. According to [J.G.], he felt Mr. Rivera put his hand on his stomach and then tried to grab his penis. He did not testify that Mr. Rivera grabbed his penis.

What if Mr. Rivera wanted to grab a 10–, 11–, or 12–year–old child's penis alone in his room in his house with Mr. Rivera, what prevented him from doing so? He could have done it. But [J.G.] does not testify that he did do it. He testified that he tried to do it. And his testimony can best be explained as the faulty memory of something that happened when he was a child, when he was waking up, when he was not fully conscious, happening seven or eight or nine years earlier.

The grabbing, the attempted grabbing of the penis incident, if I understand correctly, happened only one time. But [J.G.] also testified that Mr. Rivera grabbed his leg and caressed his ear, caressed his ear more than once. But he could only specifically remember one occasion. And grabbing of the ear and caressing ... of the leg and caressing the ear could readily be a misunderstood

conduct by Mr. Rivera, easily, which Mr. Rivera would have no memory of whatsoever.

. . . .

The State has not proven the allegations of [J.G.] beyond a reasonable doubt; and, therefore, you should not consider them for any purpose.

In addition to his discussion of J.G.'s testimony, defense counsel reiterated in his closing argument the same challenges to Doe's credibility that he had made in his opening statement.

During rebuttal, the State responded to defense counsel's arguments concerning J.G.'s testimony as follows:

[Defense counsel] told you that [J.G.] only remembered two specific incidents; and that's true, in a way. He specifically remembered two incidents, but he said that kind of touching happened a lot. But just like any other child, he is only able to relate the specific time, place[,] or not even the time but the place where it happened on two occasions but that's not ... what he said about just remembering two things.

He asked you what prevented [Rivera] from going ahead and grabbing him that night? Let me tell you. I can answer that question. Arturo, as the years progressed, became more confident, more confident of his intimidation of those boys, that they weren't going to tell on him. So confident that the last act that we had testimony of was where he grabbed the boy's pants, [Doe's] pants, pulled them down. [Doe] pulled them back up. He threw him on the floor, and he forcibly raped him. He had become that confident.

It went from the time with [J.G.] that when, yes, he did stop when [J.G.] told him to, to the point that he was not going to be denied what he wanted. That's exactly the answer to that.

## Issues One and Two

In his first issue, Rivera argues the trial court erred by admitting acts of his previous misconduct with J.G. because the evidence "was not probative of any disputed fact but was only evidence of his general bad character." *See* Tex.R. Evid. 404(b). In his second issue, Rivera contends the trial court erred by admitting the same evidence because its probative value was substantially outweighed by its prejudicial effect. *See* Tex.R. Evid. 403. We address Rivera's issues together.

## Standard of Review

We review a trial court's admission of extraneous offense evidence under an abuse of discretion standard. *Moses v. State,* 105 S.W.3d 622, 627 (Tex.Crim.App. 2003); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (op. on reh'g). We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wheeler v. State,* 67 S.W.3d 879, 888 (Tex.Crim.App.2002) (en banc).

## Rule 404(b)

Rule 404(b) of the Texas Rules of Evidence provides as follows:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

Tex.R. Evid. 404(b); *see also Montgomery,* 810 S.W.2d at 387. The list of enumerated purposes for which extraneous offense evidence may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery,* 810 S.W.2d at 387–88. Extraneous offense evidence may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387. However, the fact that extraneous offense evidence is introduced for a purpose other than character conformity does not, standing alone, make the evidence admissible. *Webb v. State,* 36 S.W.3d 164, 180 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd) (en banc). Proffered extraneous offense evidence must also be relevant to a fact of consequence in the case. *Id.* (citing *Rankin v. State,* 974 S.W.2d 707, 709 (Tex.Crim.App.1996)). Evidence is relevant if it tends to make the existence of any fact of consequence more probable or less probable than it would be without the evidence. Tex.R. Evid. 401. Extraneous offense evidence is admissible to rebut defensive theories raised by defense counsel in an opening statement or during cross-examination of a State's witness. *See Powell v. State,* 63 S.W.3d 435, 438–39 (Tex.Crim.App.2001); *Ransom v. State,* 920 S.W.2d 288, 301 (Tex.Crim.App. 1996) (op. on reh'g).

## Rule 403

Rule 403 of the Texas Rules of Evidence provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex.R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery,* 810 S.W.2d at 389. Once a trial court determines that extraneous offense evidence is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice.

*Id.; see* Tex.R. Evid. 403. A Rule 403 analysis regarding unfair prejudice requires the trial court to balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex.Crim.App.2006); *see also Erazo v. State,* 144 S.W.3d 487, 489 (Tex.Crim.App. 2004). However, "if evidence of 'other crimes, wrongs, or acts' has only character conformity value, the balancing otherwise required by Rule 403 is obviated, the rulemakers having deemed that the probativeness of such evidence is so slight as to be 'substantially outweighed' by the danger of unfair prejudice *as a matter of law.*" *Montgomery,* 810 S.W.2d at 387 (citing *United States v. Beechum,* 582 F.2d 898, 910 (5th Cir.1978)).

### Application of the Law to the Facts

Because Rivera's counsel filed a motion to exclude extraneous offense evidence under Rule 403 and Rule 404(b) and properly objected to J.G.'s testimony, the State had the burden to show that the evidence was relevant apart from its tendency to prove Rivera's character and to show that he acted in conformity therewith. *See Montgomery,* 810 S.W.2d at 387; *see* Tex.R. Evid. 403, 404(b). At the hearing on Rivera's motion to exclude the evidence, the State argued as follows: "My point is that

I think it is the type of testimony that is contextual. It shows the jury the circumstances in which the charged offenses arose and how they came to light. It does make—especially because, ... that same type of conduct was initiated in the beginning with the victim. It is going to make that child's testimony more plausible...." In response, defense counsel argued, "It doesn't show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident and it is significantly different. It doesn't show any of those." The trial court stated its ruling as follows:

> At this time the Court is going to find that the purported testimony of [J.G.] that [sic] the probative value is not substantially outweighed by the danger of unfair prejudice. I'm going to find that it can be used to show proof of motive, opportunity, intent, preparation, plan, or knowledge; and I will give any instructions you wish if ... [the State] decide[s] to put that in tomorrow.

■ The State contends that J.G.'s testimony was admissible to rebut the defensive theories introduced during defense counsel's opening statement, including lack of opportunity to commit the charged offenses and Doe's alleged lack of credibility. We agree. As discussed above, defense counsel argued in his opening statement that because Rivera's home was a small mobile home and three other people lived there, Rivera could not have committed the acts that Doe testified occurred at the home. Therefore, we find that J.G.'s testimony that Rivera acted inappropriately with him and attempted to touch his penis while he was at Rivera's home was admissible to rebut Rivera's theory of lack of opportunity, and said testimony therefore had relevance apart from its tendency to show Rivera's character and that Rivera acted in conformity therewith. *See* Tex.R.

EVID. 404(b); *Powell,* 63 S.W.3d at 438–39. Accordingly, because the trial court's ruling was within the zone of reasonable disagreement, the trial court did not abuse its discretion by determining that the evidence was admissible under Rule 404(b). *See* TEX.R. EVID. 404(b); *Wheeler,* 67 S.W.3d at 888.

▪ Defense counsel also stated during opening argument that Doe's parents never noticed any physical or emotional problems with him; that Doe never seemed reluctant to have contact with Rivera; that the nurse who examined Doe found no physical evidence of sexual assault; that Doe told two people that Rivera did not sexually assault him; that Doe possibly had a motive to fabricate the allegations because of Rivera's knowledge that Doe's mother had illegally adopted a child from Mexico; and that Rivera would testify that the offenses described by Doe did not occur. We therefore find that the trial court did not abuse its discretion by determining that J.G.'s testimony concerning extraneous offenses by Rivera was admissible under Rule 404(b). *See* TEX.R. EVID. 404(b); *Jaramillo v. State,* 817 S.W.2d 842, 844 (Tex.App.-Fort Worth 1991, pet. ref'd) (citing *Montgomery,* 810 S.W.2d at 394) ("A prerequisite for the admission of evidence to shore up a child complainant's testimony is that the defendant must first deny the act or undermine or impeach the complainant in some way before extraneous acts are admissible."); *see also Powell,* 63 S.W.3d at 438–39 (Extraneous offense may be admitted to rebut a defensive theory raised during opening statement.). We overrule issue one.

▪ Having found that the trial court did not abuse its discretion by finding that J.G.'s testimony was admissible under Rule 404(b) to rebut the defensive theories of lack of opportunity and victim's alleged lack of credibility, both of which were raised in defense counsel's opening statement, we must now determine whether the trial court abused its discretion by determining that the probative value of J.G.'s testimony outweighed any unfair prejudicial impact. *See* TEX.R. EVID. 403; *Montgomery,* 810 S.W.2d at 389. The trial court could reasonably have concluded that the probative value of J.G.'s testimony concerning Rivera's grooming behaviors and Rivera's attempt to make inappropriate sexual contact with him despite the presence of three other individuals in the home outweighed the potential prejudice to Rivera. In addition, the trial court could have found that the State's need for the evidence was considerable, since Rivera put forth defensive theories of both lack of opportunity and Doe's alleged lack of credibility. *See* TEX.R. EVID. 403; *see generally Gigliobianco,* 210 S.W.3d at 641–42.

In addition, the trial court could have reasonably concluded that J.G.'s testimony did not tend to suggest that the jury decide the case on an improper basis. *See generally Gigliobianco,* 210 S.W.3d at 641–42. The conduct in which J.G. testified Rivera engaged with him (inappropriate conversation, touching, kissing, showing of pornographic materials, and an unsuccessful attempt to touch J.G.'s penis) was much less serious and potentially inflammatory than the offenses Rivera was charged with committing against Doe (multiple instances of oral and anal penetration over a period of approximately two years). Furthermore, the trial court could have reasonably concluded that J.G.'s testimony did not tend to confuse or distract the jury from the primary issues. *See generally id.* J.G.'s testimony did not consume an inordinate or disproportionate amount of the State's case, and the State presented other compelling evidence of Rivera's guilt, such as Doe's testimony, as well as that of Farrar, Detective Parrish, and Armstrong,

and the physical evidence seized from Rivera's home.

Moreover, the trial court could have reasonably concluded that J.G.'s testimony did not tend to mislead the jury. *See* Tex.R. Evid. 403; *see generally Gigliobianco*, 210 S.W.3d at 642. The trial court gave a limiting instruction to the jury that thoroughly explained the permissible purposes for which it could consider J.G.'s testimony, and the State also emphasized to the jury in its closing argument the limited purposes for which it could consider the evidence. Finally, the trial court could have reasonably concluded that J.G.'s testimony did not cause undue delay or constitute the needless presentation of cumulative evidence. J.G.'s testimony did not consume a large portion of the trial, and it was not cumulative of other evidence. J.G. testified only for a short time; his testimony is approximately 59 pages of the 436-page reporter's record of the guilt-innocence phase.

For all of these reasons, we conclude that the trial court did not abuse its discretion by determining that the probative value of J.G.'s testimony outweighed any unfairly prejudicial impact. *See* Tex.R. Evid. 403; *Page v. State*, 213 S.W.3d 332, 337-38 (Tex.Crim.App.2006). We overrule issue two.

### CONCLUSION

The trial court did not abuse its discretion by determining that J.G.'s testimony was admissible under Rule 404(b), and that the probative value of J.G.'s testimony was not outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403, 404(b). Having overruled both of Rivera's issues, we affirm the trial court's judgment.

AFFIRMED.